JzGONZALES, Judge.
A writ of certiorari was granted herein to address a trial court judgment terminating parental visitation with two minor children previously placed in state custody after having been adjudicated as children in need of care.
FACTS AND PROCEDURAL HISTORY
YG, Sr. and CG are the parents of a daughter, SG, born on February 12, 1991, and a son, YG, Jr., born on April 29, 1993. On February 17, 1994, the parents stipulated that the father have sole custody of the children and a judgment to this effect was signed on the same day. On February 23, 1994, the children were placed in the temporary custody of the State of Louisiana, through the Department of Social Services, Office of Community Services (OCS), pursuant to La.Ch.C. arts. 619 and 620,[2] based on allegations that (1) their father was arrested and incarcerated on February 23, 1994, and was unable to make an adequate alternate plan of care for the children at the time of his arrest, and (2) their mother had left the family home and abandoned, the children shortly after the birth of the son.
*110 On March 18, 1994, the State filed a petition to have the children adjudicated as children in need of care. At a hearing held on March 24, 1994, both parents stipulated to the adjudication, and a judgment was signed, assigning custody of the children to OCS, with visitation rights given to the parents. At the 6-month dispositional review hearing held on June 30, 1994, and the 12-month dispositional review hearing held on January 26, 1996, custody was continued with OCS. The children were initially placed with their paternal grandparents, were subsequently moved to foster homes, and have been in the care of Mr. and Mrs. S.W., foster parents, since September 19, 1994. Since the adjudication, the mother has been allowed supervised visitation with the children once a month for 2 hours. The children have had no visitation with their father due to his lacontinued incarceration.
On August 4,1995, the State filed a motion to modify the March 24, 1994 disposition, seeking to have the parents’ visitation rights terminated. In support of its motion, the State alleged that, on July 28, 1995, SG was placed in a psychiatric hospital due to aggressive and abnormally sexualized behavior. Upon SG’s hospitalization, Dr. Paul Pelts, the Director of the Children’s Neuropsychiatric Inpatient Unit of Tulane University Hospital recommended that there be no further contact with her biological parents as it would be “eountertherapeutic to her and hinder her treatment.” The State based its motion on the fact of SG’s hospitalization and Dr. Pelts’ recommendation. With regard to YG, Jr., the State alleged that he too was “at risk of similar trauma and abuse if allowed to continue visitation with his biological parents” for the same reasons listed for the daughter.
Following a hearing held on August 17, 1995, the trial court rendered judgment terminating visitation between the parents and the children “until theraputically [sic] recommended.”
On September 15, 1995, the mother filed a notice of intent to file for supervisory writs with this court. On November 6, 1995, this court issued a writ of certiorari, ordering that the record be sent from the trial court, that the parties file briefs, and setting oral argument. All proceedings were stayed pending this court’s decision on the mother’s writ application.
In her brief to this court, the mother argues that the trial court erred in terminating her visitation with YG, Jr. It is her position that, although the trial court may have had sufficient reason to temporarily suspend her visitation with SG because of SG’s psychiatric hospitalization, there was no evidence presented to support the termination of her visitation with YG, Jr.
We note that the visitation rights of the father are not at issue in this appeal.
J4CHILD IN NEED OF CARE
Under applicable provisions of the Louisiana Children’s Code,[3] allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse.
(2) The child is a victim of neglect.
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.
(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the parent, and the parent is now unable to retain custody or control or the child’s welfare is otherwise endangered if left within the parent’s custody or control.
La.Ch.C. art. 606(A).[4]
The state bears the burden of proving the allegations of the petition by a ^preponderance of evidence. La.Ch.C. art. *111 665. Following an adjudication hearing, the court shall immediately declare whether the evidence warrants an adjudication of child in need of care. La.Ch.C. art. 666(A). With the approval of the petitioner, a parent whose child is the subject of pending proceedings may, with or without admitting the allegations of the petition, stipulate that the child is in need of care according to La.Ch.C. art. 606, provided that: (1) the parent personally appears before the court; (2) the court fully informs the parent of his rights as required by La.Ch.C. art. 625; (3) the court fully informs the parent of the consequences of such a stipulation; and (4) the parent knowingly and voluntarily consents to the judgment. La.Ch.C. art. 647.
When a child has been adjudicated to be in need of care, the court must enter a judgment of disposition determining where the child should be placed. La.Ch.C. art. 684. The court may place the child in the custody of a parent, another suitable person, or a private or public institution or agency. The court may commit a child found to be mentally ill to a public or private institution. The court may also grant guardianship of the child’s person to any individual, or make" such other disposition as the court deems to be in the best interest of the child. La.Ch.C. art. 681(A). The court is required to impose the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society. La.Ch.C. art. 683(A).
MODIFICATION OF JUDGMENT OF DISPOSITION
A court may modify a judgment of disposition on its own motion or on the motion of the district attorney, the Department of Social Services, the child, or his parents. La.Ch.C. art. 714(A). A judgment of disposition may be modified if the court finds that the conditions and circumstances justify the modification. La.Ch.C. art. 716. A motion to modify to impose more restrictive conditions may not be granted without a contradictory hearing unless the parties consent. La.Ch.C. art. 714(B)(2). The burden of proving justification for modification of a custody disposition of a child earlier found in need of care is on the party who seeks to modify the disposition of custody. State in Interest of Tooraen, 397 So.2d 69, 70 (La.App. 2 Cir.1981).[5]
The trial court’s determination in child custody matters involving a parent and the state is entitled to great weight, and its decision will not be disturbed on appeal absent an abuse of discretion. In re: State ex rel. Thaxton, 220 So.2d 184, 187 (La.App. 1 Cir.1969). As the trier of fact, the trial court actually hears and observes the witnesses give live testimony and is in a better position to evaluate their credibility than the appellate court, which can only read the written words of a cold record; thus, the factual findings of the trial court must be accorded great weight. Devillier v. Devillier, 536 So.2d 553, 555 (La.App. 1 Cir.1988).
ANALYSIS
In this ease, the trial court held a hearing on August 17, 1995, which encompassed the 18-month dispositional review *112 hearing, and consideration of the State’s motion to modify the original March 24, 1994, judgment of disposition. As earlier stated, the State sought to terminate the parental visitation granted in the original judgment to both parents with both children.
At the hearing, testimony was heard from the mother, the father, the paternal grandparents,[6] and Lou Ann Mayfield, the Office of Community Services caseworker supervisor, who testified because the actual caseworker assigned to the case was unavailable. Additionally, reports and letters regarding SG’s psychiatric condition and her recommended hospitalization were introduced into evidence.
Various reports and testimony in the record indicate that SG was likely the victim of sexual abuse at an early age, resulting in her exhibition of abnormally sexualized behavior. According to Judy Laurendine, BCSW, SG’s weekly therapist, SG was “the |7most sexual-ized child” she had ever encountered. In a report dated January 20, 1995, Laurendine explained that SG was knowledgeable about sexual acts and sexual flirtations and discussed how men and women put their parts together to “sex.” The child also spoke about “Mama [CG] and Daddy [YG, Sr.] sexing” and moved her own body in provocative sexual ways. Laurendine also noted that she had witnessed, and the foster parents had reportéd, .an increase in sexualized behavior by SG following visitation with her natural family. In a follow-up report dated June 28, 1995, Laurendine reported that SG was making some progress in her treatment; however, she noted her concern about the “emotional turmoil” experienced by SG after visitation with her natural family and requested that the visits be reduced.
On January 23, 1995, SG was evaluated by Dr. Carmen A. Sugai, a psychiatrist, who found that she exhibited “highly sexualized behavior” and that her interactions with adults as well as other children was sexual-ized. The psychiatrist opined that “[s]uch behavior could be a result of either being victimized sexually or having been exposed to a lot of sexually inappropriate behavior among adults.” In a follow-up report dated July 28, 1995, Dr. Sugai noted that SG had been returned to him for re-evaluation due to her increased destructive behavior at the foster home (such as breaking toys and destroying shutters), self injurious behavior (such as head-banging and skin-picking), and increased sexualized behavior toward her younger brother, including kissing and biting him, and touching him in the groin. In the July 28,1995 report, Dr. Sugai recommended that SG be hospitalized.
On July 28, 1995, SG was admitted to the Tulane University Medical Center Neuropsy-chiatric Unit. In a letter to the Office of Community Services, dated July 31,1995, Dr. Paul Pelts, the Director of the Children’s Neuropsychiatric Inpatient Unit of Tulane University Hospital who participated in a neuropsychiatric evaluation of SG, agreed that she was in need of inpatient hospitalization. Dr. Pelts diagnosed SG as suffering from severe post-traumatic stress disorder and strongly recommended that she have no contact | gwith her biological parents, because given the history, such contact would be “countertherapeutic to [SG] and hinder her treatment....”
There is no evidence in the record indicating that YG, Jr., the younger child, was also likely to have been sexually abused before being placed in the custody of OCS. Although upset by his sister’s aggressive behavior toward him, evidence in the record indicates that YG, Jr. has had no need for therapy.
Lou Ann Mayfield, the OCS caseworker supervisor, testified at the hearing. According to Ms. Mayfield, since the children had been taken into OCS’s custody, her office had been attempting to work with the parents toward the goal of reuniting them with the children. As part of OCS’s case plan, CG had been asked, among other things, to secure stable, safe housing, to seek employment, and to participate in a therapy group for mothers of sexually abused children. Ms. Mayfield testified that since the 12-month dispositional hearing, her office has had difficulty keeping track of CG because she has moved 8 or 9 times. Ms. Mayfield also testi *113 fied that CG’s participation in the therapy group had been sporadic, and that her office had been unable to verify CG’s claims of being employed.
CG testified that she initially agreed in February of 1994 that YG, Sr. have sole custody of the children because at the time she had no place, no job, and because YG, Sr. was capable of taking care of them. She also testified that she had participated in a mothers’ therapy group but admitted that her attendance was irregular. According to CG, as of the time of the hearing, she had lived with JK, her boyfriend, for one and one-half years, but had moved out once, and had also stayed with family members on several occasions for weeks at a time during that period. CG also testified that she had been employed as a painter for approximately two weeks prior to the hearing, had worked an “off-and-on job” as a painter prior to that, and had previously worked at a Burger King restaurant for 2 to 3 weeks.
CG testified that she is the mother of 2 older children (other than SG and YG, Jr.) |9who live with her mother and that she does not see them often. She stated that, if SG and YG, Jr. came to live with her, she would continue to work, would put SG in school, and would take care of the children herself, rather than taking them to live with her mother. CG stated that she had no reason to believe that YG, Sr. ever abused SG in any manner and was not questioned as to whether she was responsible for the alleged abuse.
In its oral reasons for terminating the parents’ visitation rights, the trial court stated the following regarding the mother:
The Court is very disturbed about the testimony of the home life of the children prior to and in the fall of 1994. The Court feels the children were neglected by both parents, by both of the biological parents. The Court feels that the older child, [SG], was exposed to or suffered unnatural abuse. I’m not sure and I don’t know if anybody could ever be specifically sure due to the age of this child if this abuse occurred during the time her biological parents were living together or while her father had the child or while the child was exposed to other people that were living with the father.... I cannot put a time frame on that, but I do believe that it is something that happened ... prior to February of ’94.
As you all know, that was when OCS came in and took the children and placed them in foster homes ...
[[Image here]]
Addressing the mother, [CG], apparently she left these two children with [YG, Sr.]. I’m not real sure if she was with the children in late 1993 or early ’94, and that makes it hard for me to ascertain if she was present when [SG] apparently was exposed to or had occasion to be introduced to some of the things that apparently therapy and the medical treatment [have] revealed.
It’s also interesting to the Court that ... not only did [CG] turn these two children over to [YG, Sr.] when she left him to go five with another man who she’s lived with now for approximately a year and a half, but she also has a nine-year-old who has been with her own mother, her mother, since the child was age ... one. That’s been for eight years. Then she has a six- and-a-half-year-old who has lived with her mother since birth. So her mother, the grandmother, has been mothering her two older children for the last nine or ten years.
Then we get into her more recent history working with OCS in the last year and a half, moving eight or nine times in about as many months, failing to maintain contact with OCS, and really just being an irresponsible person. Yet she’s going to get these children she says, and she’s going to place them in school and get herself a job and be responsible. Well, if history can tell me anything, I cannot believe her. The Court then is going to terminate all her rights insofar as these two children.
[[Image here]]
I am going to terminate the visitation rights of the biological parents until such time as OCS petitions the Court and tells me they feel that the biological parents have gotten their acts together and should have visitation.
After hearing all the testimony and viewing the evidence, the trial court determined | ipthat there was sufficient evidence to support the termination of CG’s visitation rights *114 with both of her children. We find no abuse of the trial court’s discretion in this regard. Aside from the evidence demonstrating that continued visitation with SG would be detrimental due to her hospitalization, there was ample evidence in the record for the trial court to conclude that CG’s continued visitation with YG, Jr. would also be detrimental. The trial court apparently gave great weight to Ms. Mayfield’s testimony which portrayed CG as a parent who had not maintained stable housing and employment and who was unwilling to regularly participate in recommended therapy. As the trier of fact, the trial court was able to evaluate Ms. May-field’s portrayal of CG and to weigh this evidence against CG’s testimony and other evidence in the record, and to then make appropriate judgments of credibility. Under these circumstances, and in light of the deference owed to the trial court’s determination, we find no abuse of discretion in the trial court’s modification of the judgment of disposition herein. We note, however, that the trial court judgment in this case is an interlocutory judgment, subject to review and modification under the provisions of La. Ch.C. art. 692.
DECREE
For the foregoing reasons, the writ filed by CG is DENIED. No costs are assessed in this pauper suit.

. Louisiana Children's Code articles 619 and 620 provide for the issuance of an instanter order directing that a child be taken into custody if the trial court determines that the child's welfare cannot be safeguarded without removal.

. The Louisiana Children’s Code was adopted by 1991 La.Acts No. 235, effective January 1, 1992.

. Louisiana Children’s Code article 606(A) was amended by 1995 La.Acts No. 1095, § 2, to read as follows:
Art. 606. Grounds; child in need of care
A. Allegations that a child is in need of care must assert one or more of the following grounds:
*111 il) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, and his welfare is seriously endangered if he is left in custody or control of that parent or caretaker.
(2) The child is a victim of neglect.
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any. other reasons, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.
(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the parent, and the parent is now unable to retain custody or control or the child's welfare is otherwise endangered if left within the parent's custody or control.
(5)The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of that parent.

. The source of La.Ch.C. art. 716 is former La. C.J.P. art. 93. In determining • the appropriate burden of proof regarding modification of dispositions, the court in State in Interest of Tooraen was interpreting former La.C.J.P. art. 93. We find the same burden of proof applicable under La.Ch.C. art. 716.

. The testimony of the father and the paternal grandparents does not relate to the issue of whether CG’s visitation rights should or should not be terminated.