764 So.2d 287 (2000)
STATE of Louisiana in the Interest of J.K.
No. 33,878-JAC.
Court of Appeal of Louisiana, Second Circuit.
June 23, 2000.
Rehearing Denied August 17, 2000.
Writ Denied October 6, 2000.
*288 Jack Wright, Jr., New Orleans, Counsel for Appellant.
Richard Ieyoub, Attorney General, Robert W. Levy, District Attorney, S. Andrew Shealy, Assistant District Attorney, Counsel for Appellee.
Before CARAWAY, KOSTELKA and CRIGLER (Pro Tempore), JJ.
CRIGLER, Judge Pro Tempore.
J.K. was adjudicated a child in need of care and continued custody of him was granted to La. Department of Social Services (OCS). J.K.'s adoptive parents, A.K. and L.K., appeal this decision. We affirm.

Facts
On October 2, 1993, soon after his birth, J.K. was adopted by A.K. and L.K. A.K. and L.K. wanted to adopt a special needs child, one who would likely not be adopted by anyone else. J.K.'s natural mother abused drugs and alcohol and was a heavy smoker; J.K. was born severely handicapped with little chance of a long life. J.K. was immediately placed in a body cast because both his legs were broken and for the first month of his life was constantly crying because he was suffering from withdrawals. J.K. was diagnosed with arthrogryposis multiplex congenita and spinal muscular atrophy.[1] J.K.'s adoptive parents were told that SMA was a progressive disease and children with SMA rarely live more than three years, but with love and care he would likely live longer. Notably, even if J.K. lived longer he would be unable to walk.
Part of J.K.'s handicap resulted in contractures in his jaws and legs, making him unable to move his jaws and leading to contractures in his knees, feet and fingers. Additionally, J.K. would not suck and was aspirating. Due to his inability to suck on a bottle, a nasal gastric tube was placed down his throat to supply needed nutrients. Later, J.K. had a gastrostomy performed on him, where a "g-tube" was placed in his abdomen through which he was fed a formula.
*289 J.K. was scheduled to undergo surgery on his legs to correct club feet. Due to J.K.'s inability to open his jaws, the surgical staff determined that he should have a tracheostomy, so that they could intubate him; a tube was placed in J.K.'s throat to breath through. A.K. and L.K. were given a "Go Bag," and were told to carry it with them at all times because if J.K. were to have trouble breathing, they were to suction any mucus out of the tube. They were also told that this would result in J.K. having more respiratory infections. J.K. also suffered through several bouts of pneumonia.
A.K. also reported that J.K. suffered from seizures, up to ten a day, and severe headaches. J.K. had severe medical problems and due to all the reported symptoms, he was placed on a lot of medication; J.K. was on eleven different medications at the time he was removed from A.K.'s and L.K.'s custody.
Dr. Meade O'Boyle (O'Boyle) first treated J.K. when he came into the emergency room on June 4, 1995. That day he was scheduled to be tested for Cystic Fibrosis (CF). According to testimony, J.K. was to undergo a "sweat test." The night before the test, A.K. called one of J.K.'s home health nurses, Ms. Addie Morris, a Registered Nurse, and asked what would result in a positive CF test. Nurse Morris told her that a high sodium level would result in a positive test. The next day, J.K. was taken to the ER and tests showed a dangerously high level of sodium in his system. This caused Dr. O'Boyle concerns because she testified that only two things can cause such a high sodium level, dehydration, which J.K. was not suffering from, and salt ingestion. According to Dr. O'Boyle and A.K., at this time the only thing J.K. ingested was a formula which he received through his g-tube. Dr. O'Boyle testified that the formula did not contain high levels of sodium.
Soon after this incident, Dr. O'Boyle became J.K.'s primary physician because she was the only doctor who would take Medicaid. Dr. O'Boyle testified that J.K. was never very healthy, was a frequent visitor to her office and she would receive calls on a regular basis in regards to his condition. Due to his many health problems, Dr. O'Boyle referred J.K. to the Arkansas Children's Hospital (ACH), where he was evaluated by a neurologist. Due to the reported seizures, J.K. was placed on Dilantin. J.K. was specifically hospitalized for Dilantin intoxication and on another occasion when hospitalized for other reasons he was found to have toxic levels of Dilantin in his system. In addition, the home health nurses documented several incidents of Dilantin intoxication. Due to the difficulty in controlling the levels, J.K. was taken back to ACH and re-evaluated. The doctors there could not find any evidence of seizure disorder and changed his medication. Based on requests from Dr. O'Boyle, soon after J.K. was taken off most of his seizure medications.
Due to the reports of severe headaches, J.K. was prescribed Zanaflex, a powerful muscle relaxant. On November 13, 1998, the home health nurses observed that J.K. was extremely limp and unresponsive. They called their supervisor, Renita Bryant, R.N., to start an I.V., and when she attempted to do this J.K. did not so much as flinch. Due to their concerns, J.K. was taken to the hospital. Dr. O'Boyle testified that when she saw him she felt he was about to die and admitted him into the Pediatric Intensive Care Unit, taking him off Zanaflex. Dr. O'Boyle testified that the next day J.K. was in bed bouncing, laughing, and watching television. At this point Dr. O'Boyle surmised that J.K. was being medically abused by his mother. Specifically, Dr. O'Boyle believed that A.K. had put salt in J.K.'s g-tube so that he would test positive for CF, that she had falsified symptoms so that the doctors would put him on more and more medications and would diagnose him with disorders which he did not have, such as seizures, and that she had continued high levels of medication, despite Dr. O'Boyle's *290 concerns and request to eliminate certain medications. In sum, Dr. O'Boyle feared for J.K.'s life if he were to be released from the hospital into A.K.'s care. Dr. O'Boyle testified that at that point she realized that J.K.'s severe, life threatening illnesses were not caused by his handicap but by A.K. As a result, she called OCS and reported her concerns. OCS conducted an investigation and removed J.K. from A.K.'s and L.K.'s custody on November 20, 1998, putting him in foster care thereby specifically choosing not to place him with A.K.'s parents.
Based on evidence presented at the adjudication hearing, the trial court found that J.K. was a child in need of care and that continued custody with the state was warranted. A.K. and L.K. have appealed this decision, arguing that the standard of proof utilized and required by the Children's Code was unconstitutional, that the state did not prove that J.K. was a child in need of care, and that the admission of "stale" psychiatric records was prejudicial.[2]

Law
"Allegations that a child is in need of care must assert one or more of the following grounds: (1)[t]he child is the victim of abuse ..., (2)[t]he child is the victim of neglect, (3)[t]he child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent, (4)[a]s a result of the criminal prosecution, the parent has been convicted of a crime against the child ... or against another child of the parent, and the parent is now unable to retain custody or control or the child's welfare is otherwise endangered if left within the parent's custody or control, (5)[t]he conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of the parent." La. Ch.C. art. 606; State in the Interest of S.G., 95 2063 (La.App. 1st Cir.3/25/96), 676 So.2d 109. The state bears the burden of proving the allegations by preponderance of evidence. La. Ch.C. art. 665; State in the Interest of S.G., supra; State in the Interest of C.W. v. Womack, 28,310 (La.App.2d Cir.2/28/96), 669 So.2d 700.
Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) sets forth three factors in determining the nature of the process due in a particular proceeding: (1) the private interest affected, (2) the risk of erroneous deprivation of that private interest and the value of any additional or substitute procedural safeguards, and (3) the countervailing governmental interest supporting use of the challenged procedure. Id.; State in the Interest of A.C., 93-1125 (La.10/17/94), 643 So.2d 743, cert. denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995).
A trial court's determination of child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. Ramphrey v. Ramphrey, 32,560 (La.App.2d Cir.12/8/99), 749 So.2d 835; Evans v. Terrell, 27,615 (La.App.2d Cir.12/6/95), 665 So.2d 648.
*291 The court shall consider all relevant evidence offered by the parties and may limit the admissibility or weight of any evidence which it deems unreliable, cumulative, or unduly dilatory. La. Ch.C. art. 709. Error may not be predicated upon a ruling admitting or excluding evidence unless a substantial right of the party is affected. La. C.E. art. 103(A). In reviewing evidentiary decisions of the trial court, the appellate court must consider whether the particular ruling complained of was erroneous and if so, whether the error prejudiced the complainant's cause, for unless it does, reversal is not warranted. Morrison v. Kappa Alpha PSI Fraternity, 31,805 (La.App.2d Cir.5/7/99), 738 So.2d 1105, writs denied 99-1668, 99-1607, 99-1622 (La.9/24/99), 747 So.2d 1120, 749 So.2d 634, 635.

Analysis: Burden of Proof
A.K. and L.K. argue that La. Ch.C. art. 665 requiring that the state prove its case by preponderance of the evidence is unconstitutional, and contend the burden of proof should be clear and convincing. In support they cite State in the Interest of A.C., supra which held the Post-Separation Family Violence Relief Act unconstitutional in that it only required proof by preponderance of the evidence before totally depriving a parent accused of sexual abuse any rights to visitation or contact with a child.
Determining the constitutionality of the burden of proof requires a balancing of the Eldridge factors. First, the private interest involved is the parent's right to a family relationship, a basic human right. Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Both the parent and the child have a vital interest in the outcome of the proceeding which threatens to limit their relationship.
The second factor allocates the risk of erroneous factfinding. An adjudication order is not a permanent termination of parental rights. In fact, within 30 days of the adjudication, a disposition hearing must be conducted. La. Ch.C. art. 678. Within nine to 12 months after the disposition hearing, the disposition must be reviewed and further reviews must be heard at least once every 12 months thereafter. La. Ch.C. art. 702. Additionally, the court may modify a judgment of disposition on its own motion or upon a motion of the district attorney, OCS, the child or his parents. La. Ch.C. art. 714. See State in the Interest of C.W. v. Womack, supra.
The risk of an erroneous factfinding in a child in need of care situation is vastly less than that in the situation that was before the court in State in the Interest of A.C., supra. In this situation, a finding for the state does not terminate parental rights; A.K. and L.K. continue to have many of their rights including the right to deny non-emergency medical treatment for J.K., which they did when the state requested the court to issue an order allowing the removal of the trach and g-tube. Additionally, A.K. and L.K. continue to have visitation rights and have the right to make contact with J.K. In State in the Interest of A.C., supra, the consequence of factfinding error resulted in deprivation of the father's visitation and contact rights, abrogating most or all of the existing family relationship that may be worth preserving. Id. In this situation, A.K. and L.K. continue to have rights to J.K., and visit with him on a regular basis under a visitation schedule which was increased during trial. Additionally, at the time of the trial the state was working toward the goal of reunification, which proposes to place J.K. back in their home when it is safe to do so. See La. Ch.C. art. 702 D(1).
The risk of placing J.K. in a home where his life is at risk when weighed against the risk of temporarily limiting access to J.K. by A.K. and L.K. while the parties work on a permanency plan for J.K. counsels in favor of the lowered standard of care. Additionally, the Children's Code requires frequent reviews and allows the court on *292 its own motion, or the motion of the parents or child, to modify the custody arrangement. These procedural protections allow the court to place J.K. back into the home while giving it the ability to protect this innocent child; if termination of parental rights is later sought, the court will give appropriate consideration to that cause of action under the heightened burden of proof.
The last factor involves the countervailing governmental interest in use of the procedure. While the government has an interest in protecting the innocent child, it also has an interest in preserving the parent-child relationship. A finding that the child is a child in need of care does not destroy this relationship, but merely proposes to temporarily modify it until such time as the child is safe in the relationship or until a judicial determination is made that grounds for termination of parental rights have been proven by clear and convincing evidence. La. Ch.C. arts. 1015, 1035. Additionally, as noted above, A.K. and L.K. maintain many of their rights, including the right to have visitation and contact with J.K. and the right to make medical determinations.
The trial court's ruling finding the preponderance of evidence standard constitutional was correct. This assignment of error is without merit.

Determination of Custody
A.K. and L.K. argue that the state failed to prove that A.K. posed a danger to J.K. or that J.K. is a child in need of care. Specifically, they allege that J.K. was to the point of death not because A.K. overdosed him, but because Dr. O'Boyle over medicated him; they allege that Dr. O'Boyle did not properly monitor J.K.'s prescription medications, almost killed him, and is now trying to exonerate herself by accusing A.K. of medically abusing J.K.
The trial court based its determination on several incidents, the first of which was the unexplained sodium level. As noted above, J.K. presented with a dangerously high sodium level in his system the day he was scheduled to take a "sweat test" for CF. According to testimony, the previous night A.K. called Nurse Morris, who told her a high sodium level would produce a positive CF test. Dr. O'Boyle testified that the only way to get a high sodium level was either dehydration, which she testified that J.K. did not have, or ingesting salt, which could have only been done by a caretaker placing it into his g-tube. Notably, even with the extreme level of sodium in his system, J.K. tested negative for CF.
A.K. had the benefit of home health nurses in her home several times a week for several hours a day. Nurse Morris testified that anytime the service decided that J.K. had progressed to the point where he no longer needed their service, she would inform A.K.; by the next day J.K. was always seriously ill again. On one occasion, they chose not to inform A.K. about the impending discharge and not only did J.K. not have any serious problems, they were actually able to discharge him from their care.
J.K. was placed on several different seizure medications due to reported seizures. While on Dilantin he suffered several intoxications. On one of these occasions, A.K. and L.K. were told to withhold his dosage. In spite of this, J.K. had an even higher level of Dilantin in his system the next day. Additionally, though several individuals have observed these "focal seizures," including one of the home health nurses, none was ever documented in a medical setting despite the fact that A.K. reported J.K. was having up to ten seizures a day. J.K. was admitted into ACH to test for seizure activity and it was discovered that he did not have a seizure disorder.
During a hospitalization at ACH for evaluation, J.K. experienced an oxygen desaturation of an extremely serious magnitude. At the time of the desaturation, the only person present in the room was A.K. After the incident, the medical staff sectioned *293 J.K.'s trach and found no secretion which would cause a desaturation; the medical staff documented that there was no medical cause for this incident. After the incident, the staff asked to put J.K. on a video monitor; A.K. agreed, but soon revoked her authorization on grounds of her own emotional stress. A.K. called Dr. O'Boyle and told her that she was uncomfortable at ACH and wanted to come home. After returning home, she told Nurse Morris that she had an unpleasant experience and felt that the staff was accusing her of doing something wrong and at the time she decided she would no longer take J.K. to ACH; instead she would take him to Dr. Pedro Mancias in Houston.
J.K. was reported to have chronic diarrhea. When Patricia Mashaw, one of the home health nurses, was changing J.K. she found a partly dissolved glycerine suppository in his diaper. A.K., watching her change J.K., immediately took the diaper and threw it away. According to medical testimony, there is no medical reason to give a child with diarrhea a suppository.
Of significant concern to this court is the issue of the medications. Due to J.K.'s illnesses, he was referred to several specialists. The combined doctors had J.K. on 11 different medications, including Zanaflex which is contraindicated considering J.K.'s condition. Additionally, Drewey H. Bynum, an expert in pharmacology, testified that the drugs J.K. was on react to each other and tend to have a combination effect. He further testified that the amounts and types of medication J.K. was on would concern him. According to Dr. O'Boyle, who continued several of the medications, though she did not approve of the medicines J.K. was on, she was reticent about changing a prescription made by a neurologist. Dr. O'Boyle testified that she did express concerns to A.K. that the Zanaflex was causing J.K. additional problems and told her she wanted to take him off of it. Dr. O'Boyle lowered the dosage; however, A.K. called her within days to say that J.K. was severely suffering so Dr. O'Boyle again increased the dosage. Dr. O'Boyle also testified that she lowered the required dosage of Neurontin; however, the home health nurses testified that A.K. continued to give the original dosage. Ms. Renita Bryant also stated that on one occasion A.K. said that she would give J.K. the Neurontin the way she wanted but understood that the home health nurse had to follow doctor's orders, so she would administer the drug herself.
Dr. O'Boyle also testified that there were several procedures which A.K. wanted done on J.K. that she thought were unnecessary, including a procedure to straighten his legs and TMJ surgery. Dr. O'Boyle testified that these procedures would have caused unnecessary pain especially since at the time they thought he would not have a long life span. While acknowledging that these things may need to be done in the future, Dr. O'Boyle felt that with time the conditions may partially resolve themselves without surgery.
A.K. had numerous witnesses, friends and family, testifying on her behalf. The witnesses testified to her love and care of J.K. They stated that J.K. was happy and was learning many skills under A.K.'s tutelage. Additionally, they testified that Dr. O'Boyle and other physicians continually gave her negative reports, stating that J.K. had but months to live. Dr. O'Boyle testified that she did write a letter to Wish I Could foundation that J.K. had less than six months to live and that he wanted to go to Disney World. Dr. O'Boyle also prepared a death service list and a No Code order, which A.K. and L.K. signed. Additionally, no one observed A.K. putting salt in J.K.'s g-tube or giving him too much medication.
Since entering foster care, J.K.'s health has significantly improved: he has had only one hospital stay, due to gagging, and since he has been weaned off excessive medications, doctor visits have become less frequent. J.K. used to be catherized daily, but since entering foster care he is never *294 catherized. He has stopped being fed through his g-tube except for one nightly feeding, and now eats solid foods. He no longer needs oxygen supplementation, has only had one bout of diarrhea, no constipation, no reported seizures, and no reported headaches. A.K. and L.K. had previously suctioned J.K.'s trach every four to six hours; in foster care, this was found to be excessive and reduced to about once a day; currently he is only suctioned as needed, and rarely needs it. J.K. has been removed from all the medication except Zantac and Propulsid, which were prescribed for reflux.
J.K. is also attending school. A.K. testified that he was not in school before because their local school had no handicap facilities and J.K. would be in a class of 25 students, which caused Dr. O'Boyle concern. A.K. stated that Dr. O'Boyle disapproved of him attending, so they home-schooled him. Dr. O'Boyle denied that school was ever brought up and she would certainly have supported J.K. attending classes, even with that high number of students.[3]
The evidence presented by the state and A.K. conflicted and the trial judge made a reasonable determination of credibility, choosing to believe the state's witnesses over A.K. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony or the facts. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). The trial court did not abuse its great discretion in finding that the state had proven by a preponderance of evidence that J.K. was a child in need of care. This assignment of error lacks merit.

Evidentiary Issues
A.K. and L.K. challenge the trial court's admission of psychiatric records on A.K. The state moved to admit A.K.'s records from when she was under the care of Dr. Frank Weinholt during 1986 and 1987; A.K. was hospitalized for a nervous breakdown, was suffering from depression and reported several failed suicide attempts. A.K. and L.K. objected timely and on appeal argue that the records were stale, are not valid in determining whether A.K. is a risk to J.K. at this point, and consequently were erroneously admitted.
The purpose of admitting the records was apparently to question A.K.'s credibility; the state wanted to show that A.K. lied about herself, her medical needs, and her past. The state put on evidence that A.K. would tell different versions of her life to different individuals. A.K. told Dr. O'Boyle that she was suffering from cancer and was seeing Dr. Marshall Leary for treatment. During her treatment of J.K., Dr. O'Boyle got concerned about A.K.'s health and called Dr. Leary, who informed Dr. O'Boyle that A.K. was not his patient. A.K. did indicate to Dr. Paul Ware that in the past she had a problem with recurrent lumps in her breast and polycystic disease and decided to have a breast removed as a preventative technique.
According to testimony, A.K. told Dr. Ware that she had one pregnancy and one birth. A.K. informed a social worker at ACH that she had one child who died of SIDS and testified that she had an abortion. A.K. told several people that she had a good marriage and her husband was very supportive, but told others that she and her husband were having marital problems and he was not very supportive. A.K. reported to Dr. Ware that she had no previous psychiatric difficulties but told one of the home health nurses and testified that she had made several attempts at *295 suicide and told another home health nurse that she had undergone shock therapy.
Relevant information must also be timely, which the admitted records were not. See State in Interest of A.E., 98 0932 (La.App. 1st Cir.9/25/98), 718 So.2d 1078. However, the records were admitted mainly to compromise A.K.'s credibility with the court, which was accomplished thoroughly through testimonial evidence. Any additional credibility issues raised by Dr. Weinholt's records were minimal, and therefore any error in admitting the records by the trial court was harmless. Morrison v. Kappa Alpha Psi Fraternity, supra.

Conclusion
For the above reasons, we affirm the trial court's determination that J.K. is a child in need of care. Appellate costs assessed to the Appellants.
AFFIRMED.

APPLICATION FOR REHEARING
Before STEWART, CARAWAY, KOSTELKA, DREW, and CRIGLER (Pro Tempore), JJ.
Rehearing denied.
NOTES
[1] At trial, it was revealed that J.K. did not have SMA and subsequently, he has a significantly longer life span expectation.
[2] The state alleged that J.K. was a victim of Munchausen Syndrome by Proxy (MSBP), a psychiatric disorder where a care taker deliberately induces or fabricates physical or psychological disorders of a child in their care for the purpose of taking on a sick role by proxy and for the secondary gain that comes along with being a brave parent. In response, the appellants raised a Daubert challenge, and both sides brought in experts who were in disagreement about whether MSBP actually existed and if A.K. could be diagnosed with it. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial court allowed testimony about MSBP; however, it specifically stated that its determination that J.K. was a child in need of care was not based on a determination that A.K. had MSBP, instead finding that all the experts agreed that children do get medically abused. A.K. and L.K. did not restate a Daubert challenge on appeal and we choose not to focus on the diagnosis of MSBP, and instead adopt the trial court's handling of this issue.
[3] A.K. and L.K. also challenged the decision by OCS and the trial court to not place J.K. with A.K.'s parents. Notably, A.K.'s parents refuse to acknowledge even the possibility that A.K. posed a danger to J.K.'s health and it appears highly unlikely they would be willing to protect J.K. This is seen by the fact that during visits, both J.K.'s parents and maternal grandparents insist on giving him treats despite the fact that the court has ordered them not to.