LPLOTKIN, Judge.
This appeal arises from the juvenile court’s denial of a motion filed by the State of Louisiana, Department of Social Services, Office of Community Services (hereinafter “OCS”) seeking modification of a prior court order in this “Child in Need of Care” proceeding. For the reasons detailed below, we affirm.
Facts
The child at issue in this case, E.P., was adjudged a “Child in Need of Care” by the Orleans Parish Juvenile Court on September 24, 1998, when her mother, C.L., stipulated to the allegations of the “Child in Need of Care” petition. That petition, which was filed by the OCS, alleged that E.P. was an abused and neglected child, and that her treating physician at DePaul Hospital, from which she was about to be discharged, recommended out-of home placement because she had threatened suicide if required to return to her mother’s home. The petition also alleged that E.P.’s mother was emotionally abusive towards the child, and that E.P.’s parents had failed to provide her with necessary food, clothing, shelter, medical care, or supervision. However, according to the petition, E.P.’s mother, 13who had sole custody, refused to cooperate with OCS’s efforts to place the child with relatives.
On December 16, 1998, the juvenile court, following a status review of this matter, instructed OCS to pursue overnight visitation of the child with her mother, stating as follows: “if overnight *1257 visitation goes well, OCS is to pursue reunification with the mother with six (6) months supervision.” According to an April 26, 1999, report from OCS, visitation between E.P. and her mother began in December of 1998, but did not go well. Thereafter, on January 15, 1999, E.P. started living with her maternal grandmother.
On April 27, 1999, following a Permanency Planning Review Hearing, the juvenile court ordered that E.P. remain in placement with her grandmother, but that she remain in the legal and physical custody of OCS. The court noted at that time that the OCS/DSS Permanency Plan was to transfer custody to E.P.’s maternal grandmother. Nevertheless, the court ordered E.P. to attend counseling and psychotherapy to prepare her for return of placement and custody to her mother. Noting that E.P.’s mother had been in substantial compliance with the court’s orders and the caseplan for re-unification, the court authorized weekly visitation between E.P. and her mother, including overnight visitation on weekends.
On June 8, 1999, the OCS filed a “Motion to Modify Judgment of Disposition,” seeking the immediate cessation of unsupervised weekend visitation by E.P. in her mother’s home. The motion alleged that conflict between E.P. and her mother had escalated into physical altercations during the last two weekend visits, resulting in E.P.’s mother calling the police and ambulances. Thereafter, on August 18, 1999, the juvenile court held another Permanency Planning Review Hearing, after which it granted legal and physical custody of E.P. to her maternal ^grandmother, subject to OCS supervision. The court also noted that the permanency plan offered by OCS was to transfer custody to E.P.’s maternal grandmother, and stated “the court now agrees with said permanency plan.” The juvenile court also appointed Court Appointed Special Advocate (hereinafter “CASA”) to the case. Noting that E.P.’s mother had been in moderate compliance with the court’s orders and the case plan for re-unification, the court ordered twice weekly visitation between E.P. and her mother, but no overnight visitation.
On December 2, 1999, OCS filed the “Motion to Modify Judgment of Disposition” that resulted in the juvenile court judgment at issue in this appeal. That motion stated, in pertinent part, as follows:
And that since the time of the last Court hearing, the following conditions and circumstances have arisen that would justify modification of the court’s Judgment, to-wit: During the most recent visit between the above noted child and her mother, which was supervised by two OCS case managers, conflict between the two escalated into a physical altercation and the police were called. [E.P.] continues to reside with her maternal grandmother, to whom custody was granted at the August 18, 1999 hearing, without incident and is not at risk in her custody.
Mover desires that the Judgment in the above entitled and numbered case be therefore modified in the following respects, to-wit: The supervised visitation by [E.P.] in her mother’s home is to cease immediately. [E.P.] is to remain in her grandmother’s custody, OCS is to be relieved of all responsibility for supervision and this case is to be placed on inactive status.
At the hearing on the motion to modify, the OCS presented the testimony of Brenda Banks, the OCS case worker who supervised some 20 visits between E.P. and her mother between August 18 and November 17, 1999. Ms. Banks testified that the interaction between the two was “varied,” but that she did not see any significant improvement in E.P.’s relationship to her mother. Ms. Banks noted that she could not recommend that E.P. move back with her mother any time in the “near future.”
|,Next, Mary Nixon, another OCS case worker, testified. Ms. Nixon had super *1258 vised only one visit between E.P. and her mother, the November 22, 1999, visit that gave rise to the motion to modify. Ms. Nixon noted that the incident began when E.P. was disciplined by her mother for throwing rocks at her younger sister; the mother told E.P. that she could not watch television. Later in the evening, on Ms. Nixon’s request, E.P.’s mother asked E.P. to give her the telephone so she could call E.P.’s grandmother to remind her to pick E.P. up on time. E.P. refused to get off the telephone and give it to her mother. The mother unplugged the telephone, but E.P. still refused to give the telephone to either her mother or Ms. Nixon. Eventually, E.P. and her mother became involved in a physical altercation over the telephone. Moreover, E.P. hit her mother, cursed her mother, and called her mother names. The mother called the police. While waiting for the police, E.P. rubbed her wrist against the floor. Ms.' Nixon also noted that E.P. was not offered food or given gifts when the other children were during that visit. However, it was Ms. Nixon’s opinion that E.P. had an “attitude,” and that the family simply chose to go on with what they were doing.
Lillian Davis, the CASA volunteer assigned to E.P., testified that E.P.’s placement with her grandmother was “positive.” Ms. Davis had visited E.P. at her grandmother’s house about four times, and felt that E.P. was not at risk living there. She stated her opinions that remaining with her grandmother was in E.P.’s best interest and that no progress had been made in E.P.’s relationship with her mother. Moreover, CASA supervisor Mrytis Thompson testified that E.P. was not at risk with her grandmother, and that no “incidents” had occurred with the grandmother.
[^Finally, E.P.’s grandmother testified that she had rules for E.P. and that E.P. abides by her rules. However, on cross-examination, she admitted that E.P. had gotten her ears pierced for the third time while living with her, despite the fact she knew that neither her mother nor her grandmother approved.
Following the hearing, the juvenile court denied the motion to modify. After briefly reciting the history of this case, the juvenile court stated as follows:
Now, we’ve had other hearings in this case. There was animosity, decided animosity, that this Court witnessed of [E.P.] towards her mother. But in prior hearings, this Court was really at a disadvantage because, of course, the Court was not there. Workers were not there. There was testimony basically that [E.P.] and her mother and maybe some other family members who might have been present, certain things happened behind closed doors. Certain noises were heard. In fact, if my memory serves me correctly, this court just could not decide previously if it was the mother’s fault, [E.P.j’s fault or the fault of both of the parties. It was for that reason that this Court ordered that the visits be supervised so that there would be somebody, a neutral person, present for the visits in case anything would happen, also to prevent anything from happening, because in the past it looked like they were ready to really go after each other. I may not remember all of the circumstances, but that seems to be my recollection. So we have supervised visitation. That’s expensive for OCS. I realize that. I believe that’s the driving force at this point in time, for OCS to get out from under that expense. I believe that. But let’s look at the merits. The motion says “That there was a physical altercation and police were called.” What caused the physical altercation? Well, the younger child threw grass at [E.P.]. Now, I’ve never heard of grass inflicting any kind of bodily injury, certainly no grievous injury on anybody. [E.P.], being older than the other child, instead of being more mature, picks up rocks and throws rocks at the other child. I have heard of people being hurt. I have heard of people being *1259 killed with rocks. I believe that [E.P.’s mother] took the appropriate action in punishing [E.P.] for those actions. No. T.V. There is no allegation that [E.P.’s mother] struck or pulled her hair or did anything physical, anything emotional, other than to say, Young lady, you are punished, you are not going to watch, [sic]television. Now, after that, according to Ms. Dixon’s testimony [E.P.] decided she didn’t want to eat until she got back home. So the question of eating or not eating is no issue, at least not to me. She didn’t want to eat to begin with. And this Court in the last hearing specifically ordered [E.P.] to obey and respect her mother during these visits. And [E.P.] was on the phone, refused to give the phone back to her mother, cursed her mother, called her mother a whore. Then the purpose of |7the phone call was to call the grandmother to make sure grandmother was going to be there on time to pick up [E.P.]. [E.P.] knew that. This was explained to her by Ms. Dixon. She would not give the phone to Ms. Dixon. What did she do instead? She ended up kicking her mother. Her mother called the police. I say amen to that. If a willful child strikes a parent and this type of behavior has been going on for years, then I congratulate [E.P.’s mother] for doing what was appropriate calling the police because her daughter committed a battery upon her. I do not fault her for doing that. Now, what else do I hear? I hear that once [E.P.] knew that the police were being called, she rubbed or scrapped [sic] her wrist on the floor and then said to the police, Look what my mother did to my wrist. This is a willful young lady who does not want to live with her mother. That’s why she causes problems when she’s with her mother. She wants to live with her grandmother. That’s why she doesn’t cause problems with her grandmother, although she is not the angel that the State and [E ,P.]’s attorney would like this Court to believe because she disobeyed her grandmother in having her ears pierced when she knew that she was not supposed to do that. Now, wouldn’t it be ironic for this Court now to grant the State’s motion as requested. It would be the same as a quasi termination of parental rights. Then [E.P.] would be living with whom she wants to live with and her mother couldn’t even see her. Her mother would have no contact. Her mother would be out of the decision-making authority altogether. Now, I don’t believe that we should have a child-in-need-of-care case for those purposes. I don’t think we should have a child-in-need-of-care case to reward willful, disobedient, disrespectful children. To me, that’s what it seems that the State is asking for, maybe not directly. But when this Court analyzes what I’ve heard today, that would be the results.
Motion denied. The rulings of this Court as noted on August 18, 1999, remain in full force and effect. Again, I repeat, the Court authorizes — the Court orders supervised visitation twice every week between [E.P.] and her mother: one said visit to be for no less than two hours and the other visits be for no less than five hours.
[E.P.] is ordered to obey and respect her mother at all times. Her mother and grandmother are ordered to cooperate fully with each other and to obey the schedule established hereinabove. One other question that was raised by the State and that is the safety of the child. It seems like the State wanted to have it two ways until I pressed. The State said if we’re going to have visits, it poses a danger to the child. So, yes, we are going to have visits. If it poses a danger to the child, those visits have to be supervised visits. No, it’s not the business of the OCS to make these kinds of decision. It was OCS who started this case. At this point in time, unless you want to file a termination of parental rights, I’m not going to grant a quasi termination of parental rights by deny *1260 ing [E.P.’s mother] any visitations. So ordered.
IsOCS and E.P. appeal, assigning three errors: (1) that the juvenile court improperly excluded relevant evidence, (2) that the juvenile court’s reasons for denying the motion to modify were improper, and (3) that the juvenile court improperly failed to reheve the OCS of supervision in this case.
Exclusion of evidence
First, the OCS and E.P. argue that the juvenile court improperly excluded testimony concerning the relationship between E.P. and her mother, as well as evidence from visits other than the most recent one, because that evidence was relevant to determination of the risk to E.P., as well as the best interest of the child. During OCS’s attorney’s questioning of Ms. Banks, the OCS case worker who supervised some 20 visits between E.P. and her mother, Ms. Banks testified that the only activities she saw E.P. share with her mother during the course of those visits was cooking together four or five times. After allowing Ms. Banks to testify about the 20 visits for six pages of transcript, OCS’s attorney again asked Ms. Banks about the cooking. The juvenile court interrupted the testimony and the following colloquy ensued:
THE COURT:
Let’s move on. You’ve covered that enough. That’s not even addressed in the motion. The motion has to deal with the two most recent visits when there was allegedly some conflict. You made no allegations that these were not perfect visits. So let’s not go into all of this and who was cooking and who wasn’t cooking, who was watching television. That’s of no moment to this Court right now.
MS. DOWLING:
Your Honor, we’re asking that all visitations cease because it has not been productive.
THE COURT:
No, that’s not in your motion.
|flMS. DOWLING:
That the visits cease?
THE COURT:
No, that the visits were nonproductive. You’re going beyond the four corners of the documents as I read it right now.
In its “Motion to Modify Judgment of Disposition,” filed on December 2, 1999, the OCS requested three “modifications” of the previous disposition: (1) immediate cessation of E.P.’s supervised visitation in her mother’s home, (2) that OCS be relieved of all responsibility for supervision, and (3) that E.P.’s case be placed on inactive status. The OCS also requested that E.P. remain in her maternal grandmother’s custody, but that is not a modification of the previous disposition. The only “conditions and circumstances” cited to justify modification of the court’s previous deposition were as follows: “During the most recent visit between the above noted child and her mother, which was supervised by two OCS case managers, conflict between the two escalated into a physical altercation and the police were called.” Thus, the juvenile court correctly held that the only visit placed at issue in the modification proceeding was the November 22, 1999, visit.
More important, however, is the fact that the juvenile court considered evidence of the 20 or so visits supervised by Ms. Banks, all of which occurred prior to “the most recent” visit on November 22, 1999. In fact, all of Ms. Banks’ testimony involves “conditions and circumstances” other than the one incident alleged by OCS in the petition to modify. The juvenile court’s ruling limiting the testimony did not occur until the evidence became repetitive. The juvenile court had the benefit of evidence concerning all the visits between E.P. and her mother between the June 8, 1999, disposition and November 22, 1999, incident. Accordingly, we find no merit in *1261 the arguments advanced by OCS on this issue.
|inDenial of motion to modify
Second, OCS argues that the juvenile court’s judgment denying its motion to immediately cease visitation between E.P. and her mother was improperly based on an assignment of fault to E.P., rather than an assessment of the risk to the child or consideration of the best interest of the child. Generally, a court considering a child in need of care proceeding must “impose the least restrictive disposition ... which the court finds is consistent with the circumstances of the case, the health and safety of the child, and the best interest of society.” La. Ch.C. art. 683(A). A motion to modify a previous disposition in a child in need of care proceeding may be granted only “if the court finds that the conditions and circumstances justify the modification.” La. Ch.C. art. 716. The burden of proving justification of modifying such a disposition rests on the party seeking modification. State in Interest of S.G., 95-2063, p. 5 (La.App. 1 Cir. 3/25/96), 676 So.2d 109, 111.
In the instant case, E.P.’s mother stipulated to the allegations of the child in need of care petition. At that point, the juvenile court had an obligation to determine “the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society.” The court in this case determined that the “least restrictive disposition” was to award custody of E.P. to her maternal grandmother, but to order continued visitation between E.P. and her mother, in an effort to repair their relationship. When the OCS sought to modify that disposition to make it more restrictive, it had the burden of proving justification for that modification.
In denying the motion, the trial court did cite E.P.’s fault in causing the November 22, 1999, incident with her mother. However, that does not automatically invalidate the trial court’s decision. The trial court in this case has Inconsistently found that E.P.’s mother was either in substantial compliance or in moderate compliance “with the court’s orders and the case plan for re-unification.” Although the trial court did not make either of those express findings in the instant case, it did find that the problems between E.P. and her mother were caused by E.P.’s willful behavior and desire to live with her maternal grandmother, rather than her mother.
Moreover, the trial court’s decision to deny the motion to immediately cease visitation between E.P. and her mother was based also on its concern that ceasing visitation would amount to a “quasi-termination of parental rights.” Because E.P.’s custody has already been given to the maternal grandmother, the only contact the mother has with E.P. is the visitation order. The trial court told OGS that it could not effect a “quasi-termination of parental rights” by filing a motion to modify a previous disposition in a child in need of care proceeding. The trial court indicated that it would consider a motion to involuntarily terminate the parental rights of E.P.’s mother, if the OCS filed such a motion.
The only case this court could find in which a juvenile court ceased ^visitation between a parent and her children that had been found to be children in need of care is State in Interest of S.G., 95-2063 (La.App. 1 Cir. 3/25/96), 676 So.2d 109. After reviewing the evidence in that case, the appellate court affirmed, stating as follows:
After hearing all the testimony and viewing the evidence, the trial court determined that there was sufficient evidence to support the termination of CG’s visitation rights with both of her children. We find no abuse of the trial court’s discretion in this regard. Aside from the evidence demonstrating that continued visitation with SG would be detrimental due to her hospitalization, there was ample evidence in the record for the trial court to conclude that CG’s *1262 continued visitation with YG, Jr. would also be detrimental. The trial court apparently gave great weight to Ms. May-field’s testimony which portrayed CG as l1ga parent who had not maintained stable housing and employment and who was unwilling to regularly participate in recommended therapy. As the trier of fact, the trial court was able to evaluate Ms. Mayfield’s portrayal of CG and to weigh this evidence against CG’s testimony and other evidence in the record, and to then make appropriate judgments of credibility. Under these circumstances, and in light of the deference owed to the trial court’s determination, we find no abuse of discretion in the trial court’s modification of the judgment of disposition herein. We note, however, that the trial court judgment in this case is an interlocutory judgment, subject to review and modification under the provisions of La. Ch. C. art. 692.
Id. at 9-10, 676 So.2d at 113-14.
As in State in Interest of S.G., we find no abuse of the trial court’s discretion in denying the motion to modify the disposition in this case. There is no evidence that E.P.’s mother is irresponsible or that she is not complying with the trial court’s orders. In fact, the trial court found that the actions taken by E.P.’s mother were appropriate in light of the actions taken by E.P. The trial court found that continued visitation between E.P. and her mother is “the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society.” La. Ch. C. art. 683. We find no merit in OCS’s arguments on this issue.
Refusal to relieve OCS of supervision
Third, OCS argues that the juvenile court improperly refused to relieve it of services of supervision and thereby end a state intrusion in a family, after the implementation of a permanency plan in a child in need of care proceeding. The trial court found that the major concern of OCS in this case was being relieved of the requirement of expending valuable resources supervising visitation in this case. However, the trial court noted that the supervision requirement was imposed because of OCS’s own allegations in this case that unsupervised visits would place |13E.P. at risk. Because the trial court found that continued visits were appropriate in this case, he refused to relieve OCS of responsibility for supervising the visitation.
Although one of the basic tenets of the “Child in Need of Care” section of the Louisiana Children’s Code is that its provisions be “administered and interpreted to avoid unnecessary interference with family privacy and trauma to the child,” La. Ch. C. art. 601, the trial court in this case found that the participation of OCS in this case is necessary. Implicit in the trial court’s finding in this ease is the instruction to OCS that it may be relieved of responsibility only by proving that formal termination of the parental rights of E.P.’s mother is warranted. We find no abuse in the juvenile court’s finding on this issue.
Conclusion
Accordingly, the juvenile court’s judgment denying the “Motion to Modify Judgment of Disposition” is affirmed in all respects.
AFFIRMED.